1998-NMCA-050

956 P.2d 848

**QUANTUM CORPORATION,**
**Plaintiff–Appellant,**

v.

**STATE of New Mexico TAXATION AND REVENUE DEPARTMENT,**
**Defendant–Appellee.**

**No. 17919.**

Court of Appeals of New Mexico.

Feb. 19, 1998.

Robert D. Gorman, Robert D. Gorman, P.A., Albuquerque, for Appellant.

Tom Udall, Attorney General, Gail Mac-Questen, Special Assistant Attorney General, Taxation and Revenue Department, Santa Fe, for Appellee.

## OPINION

WECHSLER, Judge.

{1}　Taxpayer, Quantum Corporation, and certain non-profit organizations are parties to "bingo lease" agreements under which the non-profit organizations use space in buildings leased and renovated by Taxpayer for bingo games.　Taxpayer appeals a decision and order of the hearing officer of the New Mexico Taxation and Revenue Department (Department) assessing gross receipts taxes and interest on Taxpayer's proceeds under these agreements.　The hearing officer found that the agreements were licenses, not leases, and that the income was subject to gross receipts taxes under NMSA 1978, § 7-9-53(A) (1991).　Taxpayer raises two issues on appeal:　(1) whether the hearing officer was incorrect in concluding that these arrangements were licenses and not leases;　and (2) if the agreements are leases, whether rent Taxpayer received for leasing equipment within the buildings is deductible under Section 7-9-53(C).　We reverse on the first issue and remand for the hearing officer to decide the second issue consistent with this opinion.

*Facts*

{2}　Taxpayer is a New Mexico corporation and engages in the business of leasing three buildings which it has remodeled and customized for purposes of conducting bingo games.　The remodeled interiors include large open spaces for bingo patrons, a sales counter, a public address system and speakers, storage closets, a manager's office with floor safes, and snack bar areas.　Taxpayer has placed bingo game equipment such as a

flashboard, a bingo blower machine, and television monitors in the building. Taxpayer enters into agreements with non-profit organizations which conduct bingo games in the building during specified sessions. The premises described in the agreements include the facility and equipment, but exclude the snack bar areas.

{3} Taxpayer entered into agreements with several non-profit organizations for each building. The term of each agreement is one year. The agreements specify the sessions when the organizations use the premises, typically four or five per week, ranging from one and one-half hours to three and one-half hours in length. The non-profit organizations rent the facility for $100 per session, regardless of the length of the session. Taxpayer charges $50 per session for equipment rental.

{4} The organizations must make reasonable requests to Taxpayer for access at times other than the sessions designated in the agreements. They have a building key and know the building alarm code. Each organization has a floor safe for its exclusive use, as well as secure storage closets in which they store their bingo supplies. The organizations pay a pro rata portion of utility and cleaning fees. Taxpayer has access to the premises at any time.

{5} Under the agreements, the organizations must adhere to strict use of the premises. They may use the building only for bingo sessions and related services. The agreements require the organizations to carry public liability insurance and provide security guards. They may not permit anyone to bring food, drinks, or bicycles into the building. Children under the age of 14 are allowed only in the television room, and no solicitation is allowed in the building.

{6} The organizations pay rent for each session whether or not they hold the session. Taxpayer can maximize rental revenues by having seven organizations per building, with four sessions per week per organization. With this arrangement, Taxpayer could earn an annual income from the agreements of approximately $145,000 from session fees and $72,000 from equipment rental per facility.

Taxpayer pays approximately $100,000 per year to lease each building.

{7} The agreements establish a management committee, consisting of representatives of each non-profit organization, as well as Taxpayer's representative. The management committee may set policies for the building; however, in its sole discretion, Taxpayer can adopt policies which will control in the event of a conflict or inconsistency.

*Discussion*

{8} Generally, this Court reviews a hearing officer's decision regarding a protestant's tax liability for the limited purpose of determining whether it is: "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with the law." NMSA 1978, § 7–1–25 (1989): In this case, we are asked to determine whether the hearing officer's decision accords with the statutory definition of "lease" or "leasing" found in Section 7–9–53(A) and NMSA 1978, § 7–9–3(J) (1994). As such, we are called upon, in part, to answer a question of statutory interpretation, *see Security Escrow Corp. v. Taxation & Revenue Dep't,* 107 N.M. 540, 543, 760 P.2d 1306, 1309 (Ct.App. 1988), which we review de novo, *see Cox v. Municipal Boundary Comm'n,* 120 N.M. 703, 705, 905 P.2d 741, 743 (Ct.App.1995). Because the statutes in question must be read in connection with other statutes concerning the same subject matter, *see State ex rel. Quintana v. Schnedar,* 115 N.M. 573, 575–76, 855 P.2d 562, 564–65 (1993), we also review the hearing officer's decision to determine whether it accords with the Bingo and Raffle Act, NMSA 1978, §§ 60–2B–1 to –14 (1981, as amended through 1991) (Bingo Act). Finally, to the extent that this case involves the application of the law of leasing to undisputed facts, we review the hearing officer's decision de novo, as we do other questions of law. *See Edens v. New Mexico Health & Soc. Servs. Dep't,* 89 N.M. 60, 62, 547 P.2d 65, 67 (1976) (when the historical facts are undisputed, the question whether the accident arose out of and in the course of employment is a question of law).

{9} The Gross Receipts and Compensating Tax Act defines leasing as "any arrangement whereby, for a consideration, property is employed for or by any person other than the owner of the property, except that the granting of a license to use property is the sale of a license and not a lease." Section 7–9–3(J). Generally speaking, this Court has defined a lease as " 'an agreement under which the owner gives up the possession and use of his property for a valuable consideration and for a definite term.' " *Cutter Flying Serv., Inc. v. Property Tax Dep't,* 91 N.M. 215, 219, 572 P.2d 943, 947 (Ct.App. 1977) (quoting *Transamerica Leasing Corp. v. Bureau of Revenue,* 80 N.M. 48, 51, 450 P.2d 934, 937 (Ct.App.1969)). The tenant must acquire some definite control and dominion of the premises. *See Cutter Flying Serv., Inc.,* 91 N.M. at 219–20, 572 P.2d at 947–48.

{10} Our legislature has not defined "license" in any of our statutes. When not defined, we will use a word according to its ordinary meaning unless a different intent is clearly indicated. *See New Mexico Sheriffs & Police Ass'n v. Bureau of Revenue,* 85 N.M. 565, 566, 514 P.2d 616, 617 (Ct.App. 1973). Black's Law Dictionary defines "license" as "permission by competent authority to do an act which, without such permission, would be illegal, a trespass, a tort, or otherwise not allowable." Black's Law Dictionary 920 (6th ed.1990); *see New Mexico Sheriffs & Police Ass'n,* 85 N.M. at 566, 514 P.2d at 617. A license does not create an interest in land; it is similar to a tenancy at will. *See Cutter Flying Serv., Inc.,* 91 N.M. at 219, 572 P.2d at 947.

{11} Taxpayer argues that the intent of the parties controls and that the face of the document entitled "bingo lease," as well as the contents of the document, demonstrate that the parties intended a lease. The Department argues that the agreements are licenses because they do not convey an interest in real property, they do not provide for exclusive possession, and the organizations have insufficient control over the property to constitute a lease.

{12} Under general law, the character of the instrument is not controlled by its form, "but from the intention of the parties as shown by the contents of the instrument." *Transamerica Leasing Corp.,* 80 N.M. at 51–52, 450 P.2d at 937–38; *S.S. Kresge Co. v. Bureau of Revenue,* 87 N.M. 259, 260, 531 P.2d 1232, 1233 (Ct.App.1975). We review the entire contents of the instrument—the language employed, the subject matter, and when doubt exists, the surrounding circumstances—to determine if exclusive control and possession of a definite space for a definite term has been granted. *See Town of Kearny v. Municipal Sanitary Landfill Auth.,* 143 N.J.Super. 449, 363 A.2d 390, 394 (Law Div.1976); 49 Am.Jur.2d *Landlord and Tenant* § 19, at 63 (1995); *see generally S.S. Kresge Co.,* 87 N.M. at 260, 531 P.2d at 1233; *Transamerica Leasing Corp.,* 80 N.M. at 52, 450 P.2d at 938.

{13} The agreements are called "bingo leases" and have a stipulation for rent in exchange for transfer of possession. The agreements are for a one-year term, consisting of four or five sessions per week. The organizations pay $100 per session whether the facility is used or not. Taxpayer is giving up possession and use of its property during the periods of use by the non-profit organizations. While each agreement is for a definite term of one year, the duration of the sessions is atypical. Each session consists of a period of time of less than four hours. A typical lease arrangement would grant exclusive possession and use to one party for a period of time comprised of days, not hours.

{14} The Bingo Act provides an explanation for this atypical time arrangement. It restricts non-profit organizations to 260 sessions a year, five sessions a week, of no more than four hours each, and no more than two sessions a day. Section 60–2B–8(G), (K). The New Mexico Regulation and Licensing Department, which administers the Bingo Act, limits the amount of rent paid per session to $100. With such restrictions, it is reasonable to expect that a non-profit organization would not enter into a lease arrangement which would give it exclusive possession of a facility twenty-four hours, seven days a week. Such a lease arrangement would not be profitable for the organization. Additionally, a non-profit organization is not

allowed to be a lessor of a facility and also conduct games of bingo. *See* § 60–2B–8(U). Thus, an organization would not be able to lease a facility and sublease or rent it to other non-profit organizations to limit costs for concern of violating the Bingo Act.

{15} Significantly, Taxpayer does not have a right to revoke use of the premises at any time. The right to revoke is consistent with a license, not a lease. *See City of Watertown v. Dakota, Minn. & E. R.R. Co.*, 551 N.W.2d 571, 576 (S.D.1996) (license is generally revocable at will); *Sammons v. American Auto. Ass'n*, 912 P.2d 1103, 1105 (Wyo.1996) (same); *see generally Cutter Flying Serv., Inc.*, 91 N.M. at 219, 572 P.2d at 947.

{16} The Bingo Act requires organizations to list the facility in which they will conduct bingo games in their requests for licenses. Section 60–2B–6(A)(5). Therefore, a non-profit organization would undoubtedly want the protection of a regular, reliable location afforded by a lease, not a license, since switching locations would require additional interaction with, and perhaps new approval of, the Regulation and Licensing Department. Also, non-profit organizations conduct bingo games to raise funds. Patrons who wish to support a particular non-profit organization want to know a regular schedule of where and when the organization conducts its bingo games. A lease arrangement affords such consistency, while a license without more does not.

{17} The Department argues that the organizations have insufficient control over the premises to constitute a lease. The hearing officer found that limitations upon the use of the building are indicative of lack of control. However, some of these restrictions appear to exist to facilitate compliance with the Bingo Act. *See* §§ 60–2B–4 (licensing authority), –6 (application for license), –14 (penalties). The lease limitations also include restricting children to certain portions of the building and limiting the use of the facility for bingo and services. *Cf.* NMSA 1978, § 60–2E–26(F) (1997) (persons under age of twenty-one shall not enter gaming areas).

{18} Additionally, both Taxpayer and non-profit organizations must comply with the Bingo Act or face possible sanctions or penalties. The Regulation and Licensing Department can suspend or revoke organizations' licenses, fine them, or declare them ineligible for a license for violating the Bingo Act or rules and regulations of the Regulation and Licensing Department. Section 60–2B–4(E), (G). Taxpayer faces similar sanctions. Section 60–2B–4(G) ("The declaration of ineligibility may be extended to include . . . an organization otherwise affiliated with the violator when in the opinion of the licensing authority the circumstances of the violation warrant that action."). Taxpayer can also incur criminal penalties including fine or imprisonment. Section 60–2B–14 ("[E]very other person or corporation who willfully violates or who procures, aids or abets in the willful violation of the Bingo and Raffle Act . . . is guilty of a misdemeanor.").

{19} Taxpayer's corporate purpose is to customize and rent buildings for bingo games. Taxpayer must take precautions to ensure compliance with the Bingo Act for if it were to be sanctioned by the Regulation and Licensing Department, Taxpayer's corporate purpose would be frustrated. Even a one-time fine or sanction could have longer term financial repercussions for Taxpayer. As part of the licensing process, if a non-profit organization rents or leases a facility to conduct bingo games, it must attach a signed statement from the facility owner or operator stating the location and rent to be paid and "that the person, or its officers and directors if a corporation, is of good moral character and has not been convicted of any crime involving moral turpitude." Section 60–2B–6(C). Hence, with potential criminal punishment and monetary penalties, and loss of long-term business, Taxpayer has understandably placed tighter restrictions on the use of its premises. *See Schloss v. Sachs*, 63 Ohio Misc.2d 457, 631 N.E.2d 212, 216 (Ohio Mun.Ct.1993) (candy company's right to use a kiosk in the mall held a lease, not a license, because the proprietor had exclusive possession and power to exclude, "irrespective of how much control the lessor/licensor has over the lessee/licensee or the operation of its business").

{20} Many other provisions of the agreements which may indicate that Taxpayer has some degree of control over the premises, such as those regarding public liability insurance, security guards, parking, thermostat settings, bankruptcy, and right of entry, are not uncommon to modern commercial leasing. *See* 31 Jacob Rabkin & Mark H. Johnson, *Current Legal Forms with Tax Analysis,* Forms 23.22, 23.27, 23.30, 23.55 (1997). Moreover, Taxpayer's compliance with the Bingo Act may account for some of these provisions. The Bingo Act requires that the premises and equipment used "shall at all times be open to inspection by the licensing authority" and that games must be conducted only with equipment which is "owned or leased by the licensee." Section 60–2B–8(A), (F). Taxpayer's ability to enter the premises further promotes compliance with the Bingo Act.

{21} Finally, we note that despite its extensive regulation of bingo operators and facilities, the Bingo Act contemplates that a lease is a vehicle for non-profit organizations to use premises for conducting bingo games. *See* §§ 60–2B–6(C), –8(U). But if we were to accept the Department's arguments, a lease arrangement under the Bingo Act would be impossible. Indeed, the Bingo Act restricts Taxpayer's actions and so its actions must be seen through the Act. While the arrangement between Taxpayer and various non-profit organizations might not resemble a "typical" lease, restrictions in the Bingo Act account for the type of arrangement created, which the intent and surrounding circumstances support as a lease. The payment of rent, possession for definite periods of time, exclusive possession of the floor safes and secure storage closets, and the inability of Taxpayer to revoke at will favor a lease. *See Town of Kearny,* 363 A.2d at 394 (presence of (1) stipulation for rent such as payment for the transfer of possession and (2) a term; and absence of (1) limitation on exclusive possession and control of the premises, and (2) a right in the owner to revoke the permit to use at any time, are factors indicating existence of a lease); *see also Friend v. Gem Int'l, Inc.,* 476 S.W.2d 134, 138–39 (Mo.Ct. App.1971) (furniture company and department store created lessor/lessee relationship because furniture company occupied specific space to exclusion of others and computation of rent based on sales percentage accounted for lessor's right to enter for purpose of checking lessee's register receipts); *Regan v. City of Seattle,* 76 Wash.2d 501, 458 P.2d 12, 13–15 (1969) (court found a lease between city and go-cart operator because lessor had sufficient control of the portion of the premises, despite provisions in the agreement stating that the building was under charge and control at all times by the city building superintendent, accessible by city at any time, and term was for only one day). Therefore, we determine that the term "lease" or "leasing" as it appears in Sections 7–9–53(A) and 7–9–3(J) was intended to include the agreements which are the subject of this appeal, and we reverse the hearing officer's determination to the contrary.

*Conclusion*

{22} Because we determine that the agreements which are the subject of this appeal are "leases" within the meaning of Section 7–9–53(A), we reverse the hearing officer's determination that Taxpayer's receipts for rental of bingo hall space are not deductible under that section. However, because it appears that the hearing officer's conclusion regarding the deductibility of Taxpayer's receipts from the rental of bingo equipment was based on its erroneous determination that the agreements were not leases, we remand for further proceedings on that issue consistent with this opinion.

{23} **IT IS SO ORDERED.**

PICKARD and ARMIJO, JJ., concur.