2003-NMCA-033

62 P.3d 1236

**Vicki C. GROGAN, d/b/a Tobacco Patch, Id. No. 02–397117–00–7, Protestant–Appellant,**

v.

**NEW MEXICO TAXATION AND REVENUE DEPARTMENT, Respondent–Appellee.**

**No. 22,552.**

Court of Appeals of New Mexico.

Dec. 11, 2002.

Certiorari Denied, No. 27,856, Jan. 31, 2003.

Matthew E. Cohen, Clara Ann Bowler, Albuquerque, NM, for Appellant.

Patricia A. Madrid, Attorney General, Bruce J. Fort, Special Assistant Attorney General, Santa Fe, NM, for Appellee.

## OPINION

SUTIN, Judge.

{1} Taxpayer Vicki C. Grogan, d/b/a Tobacco Patch, appeals from a New Mexico Taxation and Revenue Department hearing officer's decision and order upholding the Department's gross receipts tax assessment against Taxpayer's unreported receipts from "buy-down" contracts and "shelf-display" contracts with cigarette manufacturers. Taxpayer also appeals the Department's assessment of a penalty for negligence. We affirm.

## BACKGROUND

{2} Taxpayer is a sole proprietor engaged in the retail sale of tobacco products purchased from wholesale suppliers. She entered into two types of written contracts directly with cigarette manufacturers.

These contracts are known in the industry as "buy-down" and "shelf-display" contracts.

### The Buy-down Contracts

{3} Under the buy-down contracts, Taxpayer agreed with the manufacturers to advertise and sell cigarettes at a specified discount for a specified period of time, known as the promotion time. The manufacturers paid Taxpayer amounts (hereafter payments) that essentially made up the difference between Taxpayer's usual retail price and the discounted price set in the contracts.

{4} It is the manner in which the parties characterize the nature of the payments that creates the issue for appeal. Taxpayer contends the payments are inventory based. She asserts that, under the contracts, the payments are refunds based on Taxpayer's inventory, not based on sales. Taxpayer thus characterizes the contracts as involving the cost of doing business. She argues that the discount benefits the manufacturers because it reduces Taxpayer's inventory expenses, allowing her to offer special discounts and thereby increase her volume of sales. She points out that the evidence, consisting of worksheets she prepared for the manufacturers, showed that the payments were based on inventory records from which Taxpayer set out her beginning inventory, inventory thereafter purchased, and ending inventory. From this, Taxpayer argues that the manufacturers intended to give a discount based on inventory, because "[i]f the manufacturer[s] intended to give a discount on sales, [they] would have calculated the discount directly from Taxpayer's retail sales records."

{5} The Department describes the contracts as ones in which Taxpayer is either (1) being reimbursed by the manufacturers for the revenue foregone from selling cigarettes at a discounted price, or (2) receiving consideration for promoting the sale of cigarettes at a discounted price. The Department argues that the arrangement does not create a "retroactive discount" on new purchases of inventory. The nature of the buy-down programs, the Department explains, is not that of inventory purchase and reduction, lowering the cost of doing business by the pay-ments. Rather, the Department asserts, the nature of the programs is that of keeping track of cigarettes sold at a discount and then receiving payments for the promoted sales.

{6} The hearing officer entered the following findings of fact:

5. Under the terms of her buydown contracts (also referred to by some manufacturers as a "price promotion" or "discount program"), the Taxpayer agreed to reduce the price of certain brands of cigarettes by a specified dollar amount for a specified period of time. The Taxpayer also agreed to cooperate with the cigarette manufacturer in posting signs to advertise the discounted price. In return, the manufacturer agreed to pay the Taxpayer the difference between her usual retail price and the discounted price of the cigarettes covered by the agreement.

6. The amount of the buydown was determined by calculating the Taxpayer's inventory of covered cigarettes on the day the promotion began, adding inventory purchased during the promotion and then subtracting the inventory remaining at the end of the promotion. The resulting figure, which equaled the number of cigarettes sold at the discounted price, was then multiplied by the amount of the discount.

7. Because the Taxpayer was reimbursed the exact amount of the sales discount, the buydown program did not generate additional profit for the Taxpayer on a per pack or per carton basis. The Taxpayer did benefit, however, from the increased traffic and sales volume that resulted from selling cigarettes at a discounted price.

8. When selling cigarettes under the terms of a buydown contract during the audit period, the Taxpayer charged her customers gross receipts tax on the discounted price and did not include the buydown amount she received from the manufacturer when reporting her gross receipts to the Department.

Taxpayer challenges findings of fact numbered 5 and 7. She also challenges the hear-

ing officer's conclusion of law number 2 that "[t]he Taxpayer's receipts from her buy-down contracts with cigarette manufacturers come within the definition of gross receipts and are subject to tax."

*The Shelf–Display Contracts*

{7} Under one-year shelf-display contracts, representatives of the manufacturers set up and stocked their own shelf and counter displays at a designated location in Taxpayer's store. The dispute centers on whether these contracts constituted leases or licenses.

{8} The hearing officer found that, under the terms of these contracts, Taxpayer (1) permitted manufacturers "to place free-standing, movable shelves at designated places in the store and temporary displays on the counter or hanging from the ceiling"; (2) gave manufacturers a priority over shelf and advertising placement and feet of shelf space based on sales volume; and (3) agreed that each manufacturer would set up and stock its own displays, but had access to do so only during the hours Taxpayer's store was open, 6 a.m. to 6 p.m., six days a week. The hearing officer also found that Taxpayer kept the shelves stocked for the manufacturers during the month-long period between the representatives' visits to the store. The hearing officer concluded that "[t]he Taxpayer's receipts from her shelf-display contracts with cigarette manufacturers are not receipts from the lease of real property, and the Taxpayer is not entitled to the deduction provided in [the statutes]." Taxpayer challenges this conclusion of law. Taxpayer does not challenge the findings of fact, but contends evidence presented at trial not recited in the findings should be considered.

*The Assessment, Protest, and Administrative Decision*

{9} In an administrative hearing on Taxpayer's protest, the Department's hearing officer upheld the Department's assessments of (1) gross receipts tax of $23,931.86 on unreported "buy-downs" received by Taxpayer from manufacturers; (2) tax of $555.23 on unreported receipts under the shelf-display contracts; (3) a penalty based on Taxpayer's

negligence; and (4) interest associated with the two assessments. Pursuant to NMSA 1978, § 7–1–25 (1989), Taxpayer appeals the hearing officer's decision and order upholding the Department's assessments of gross receipts tax and penalty.

**DISCUSSION**

**A. The Standard of Review and Presumptions**

{10} We will set aside the "decision and order of the hearing officer only if found to be: (1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with the law." § 7–1–25(C); *Carlsberg Mgmt. Co. v. Taxation & Revenue Dep't*, 116 N.M. 247, 249, 861 P.2d 288, 290 (Ct.App.1993). "We view the evidence in the light most favorable to the [Department's] decision to determine whether the decision is supported by substantial evidence in the record as a whole." *Id.; Brim Healthcare, Inc. v. Taxation & Revenue Dep't*, 119 N.M. 818, 819, 896 P.2d 498, 499 (Ct.App.1995). To the extent our review involves interpretation of a statute, or the application of law to undisputed facts, the review is de novo. *Quantum Corp. v. Taxation & Revenue Dep't*, 1998–NMCA–050, ¶ 8, 125 N.M. 49, 956 P.2d 848.

■ {11} There exists a statutory presumption that all receipts are taxable. NMSA 1978, § 7–9–5 (1966) (amended 2002). The taxpayer claiming that receipts are not taxable bears the burden of proving that assertion. *TPL, Inc. v. Taxation & Revenue Dep't*, 2000–NMCA–083, ¶ 8, 129 N.M. 539, 10 P.3d 863, *cert. granted*, 129 N.M. 519, 10 P.3d 843; *ITT Educ. Servs., Inc. v. Taxation & Revenue Dep't*, 1998–NMCA–078, ¶ 5, 125 N.M. 244, 959 P.2d 969; *Brim Healthcare*, 119 N.M. at 820, 896 P.2d at 500; *Wing Pawn Shop v. Taxation & Revenue Dep't*, 111 N.M. 735, 741, 809 P.2d 649, 655 (Ct.App. 1991).

{12} The Department's assessment is presumed to be correct. NMSA 1978, § 7–1–17(C) (1992); *Carlsberg*, 116 N.M. at 249, 861 P.2d at 290. "The effect of the presumption of correctness is that the taxpayer has the burden of coming forward with some countervailing evidence tending to dispute the factual correctness of the assessment made

by the secretary. Unsubstantiated statements that the assessment is incorrect cannot overcome the presumption of correctness." 3.1.6.12(A) NMAC 2001.

## B. The Buy-down Contract Payments Are Taxable

{13} Our initial inquiry is whether the payments made under the buy-down contracts constitute taxable gross receipts. The inquiry centers on whether the payments are to be taxed as reimbursements of revenue that would have otherwise been lost due to the sale of cigarettes at a discounted price, or whether the payments are to be viewed as a method of lowering the cost of doing business and therefore are not taxable. The inquiry includes whether the payments fall within the statutory exclusion for "cash discounts allowed and taken" contained in NMSA 1978, § 7–9–3(F)(2)(a) (2002).

{14} Taxpayer suggests that if we look at the substance of the transactions, and not simply at generalized rules and regulations, the result will favor Taxpayer. The Department simplifies the transaction in these words: The payments merely "put[ ] the same amount of money in [Taxpayer's] bank accounts as she would have [had] had the cigarettes sold for the original retail price."

### 1. Reimbursement v. Reduction of Inventory Costs

{15} " '[G]ross receipts' means the total amount of money or the value of other consideration received from selling property in New Mexico, . . . or from performing services in New Mexico." § 7–9–3(F). We are persuaded that the payments constitute gross receipts under Section 7–9–3(F). We do not accept Taxpayer's underlying premise that the manufacturers discounted her inventory purchases through payments "directed to Taxpayer's cost of doing business." Therefore, we do not accept her contention that gross receipts tax cannot be assessed against her as a purchaser of product, but rather only against her suppliers as sellers. The payments are reimbursements to Taxpayer for her sales loss incurred as a result of engaging in the discount promotions. The payments place her in the same position as if

she had sold the cigarettes at the non-discounted price.

{16} The hearing officer stated in her decision that under several of Taxpayer's buy-down contracts, Taxpayer agreed to perform promotional services in order to receive the payments. Based on this finding, the hearing officer concluded that the gross receipts tax constituted either "additional consideration for the sale of cigarettes" or "consideration for performing promotional services," under Section 7–9–3(F). See § 7–9–3(F) (defining gross receipts to include "the value of other consideration received from selling property"). Because we determine that the payments constitute "money . . . from selling property" under Section 7–9–3(F), we need not address whether the conclusion reached by the hearing officer provides an alternative, independent basis for upholding the gross receipts tax assessment. We state only that the valuable and mutual benefit to the manufacturers and to Taxpayer intended from the buy-down contracts, at the very least, supplies strong support for the conclusion that these types of payments were intended by the Legislature to constitute gross receipts under Section 7–9–3(F).

### 2. Cash Discounts Allowed and Taken

{17} " 'Gross receipts' excludes: (a) cash discounts allowed and taken." § 7–9–3(F)(2)(a). This exclusion provides a tax exemption. When a taxpayer relies on an exemption, we construe the statute strictly in favor of the Department. *TPL, Inc.*, 2000–NMCA–083, ¶ 8, 129 N.M. 539, 10 P.3d 863 (stating that "[w]hen a taxpayer claims a tax deduction, the statute giving rise to such a deduction 'must be construed strictly in favor of the taxing authority' ") (quoting *Sec. Escrow Corp. v. Taxation & Revenue Dep't*, 107 N.M. 540, 543, 760 P.2d 1306, 1309 (Ct.App. 1988)). As we stated in *TPL, Inc.*: "Put another way, taxation is the rule and the burden is on the taxpayer to bring itself within any claimed exception." *Id.*

{18} Furthermore, the taxpayer must clearly establish the exemption. *Wing Pawn Shop*, 111 N.M. at 740, 809 P.2d at 654.

In addition, "the right to the exemption ... must be clearly and unambiguously expressed in the statute." *Id.*

{19} The Department's regulation based on the Section 7–9–3(F)(2) exclusion reads:

> Discount coupons: The gross receipts attributable to a sale in which a seller accepts discount coupons provided by buyers are measured by the cash received plus the value of the coupon. However, if the discount coupon is not redeemable by the seller, the acceptance of the coupon constitutes a cash discount allowed and taken and is excluded from gross receipts.

3.2.1.14(I) NMAC 2002. This regulation is presumed to be a proper implementation of the statute. NMSA 1978, § 9–11–6.2(G) (1995) (comparable provisions formerly NMSA 1978, § 7–1–5(G) (repealed 1995)); *Hawthorne v. Taxation & Revenue Dep't*, 94 N.M. 480, 481, 612 P.2d 710, 711 (Ct.App. 1980) ("Any regulation ... issued by the [commissioner] is presumed to be in proper implementation of the provisions of the revenue laws administered by the [bureau]." (alteration in original)). The regulation is entitled to substantial weight. *See State ex rel. Battershell v. City of Albuquerque*, 108 N.M. 658, 662, 777 P.2d 386, 390 (Ct.App.1989); *Strebeck Props., Inc. v. Bureau of Revenue*, 93 N.M. 262, 268, 599 P.2d 1059, 1065 (Ct. App.1979) (recognizing that "administrative interpretations are entitled to great weight in ascertaining the meaning of the statute"); *Miller v. Bureau of Revenue*, 93 N.M. 252, 254, 599 P.2d 1049, 1051 (Ct.App.1979) ("[T]he construction given a statute by the administrative agency charged with the enforcement of it is a significant factor to be considered by the courts in ascertaining the meaning of such statute.") (internal quotation marks and citation omitted).

{20} The Department explains its regulation as follows:

> [W]here a merchant is able to redeem the coupon from the manufacturer, the amount of that redemption is a taxable receipt. Where the merchant cannot redeem the coupon, the coupon represents a cash discount allowed and taken. The two types of coupons discussed in the regulation are

sometimes referred to as "manufacturer's coupons" and "store coupons," respectively. "Store coupons" are not taxable since the merchant receives nothing; "manufacturer's coupons" are taxable to the face value of the coupons.

The Department argues that the payments at issue in this case are, in substance, redemptions by a merchant of a manufacturer's coupon, in that, according to the Department, the retailer receives consideration from the manufacturer to reimburse the merchant for revenues which would otherwise have been lost on the sale at a discounted price.

{21} Taxpayer contends that we should disregard the distinction advanced by the Department between a manufacturer's coupon and a retailer or store coupon because such a distinction is not found in Section 7–9–3(F)(2)(a). Taxpayer interprets the statute to exclude cash discounts allowed and taken at the time of sale, regardless of whether the discounts emanate from the retailer or manufacturer. Taxpayer also argues that the "payments were *not* generated by her acceptance of a discount coupon from her consumers and, therefore, NMAC 3.2.1.14 I does *not* apply." Further, Taxpayer asserts that the exclusion is designed to encourage taxpayers to engage in discount sales, and the interpretation of the statute advanced by the Department violates that legislative purpose because it will discourage, rather than encourage, discount sales. Taxpayer does not support these contentions with authority, evidence, or persuasive rationale.

{22} A more reasonable explanation of the exclusion's purpose is that it assures retailers, who discount the original retail price and receive no manufacturer reimbursement for the discounted amount, that they will not be taxed under the very broad definition of gross receipts in Section 7–9–3(F). Also, the words "cash discounts allowed and taken" more reasonably fit the circumstance in which a retailer chooses, for whatever reason, to accept less for the product sold, no matter what the value of the product. A retailer who is reimbursed the discounted amount does not absorb the cash loss. Such a retailer is in no position to claim an exclu-

sion. Taxpayer has failed to clearly establish her right to claim such an exclusion. *See Wing Pawn Shop,* 111 N.M. at 741, 809 P.2d at 655; *Proficient Food Co. v. Taxation & Revenue Dep't,* 107 N.M. 392, 397, 758 P.2d 806, 811 (Ct.App.1988) (holding retailer failed to cite authority to support its argument and failed to establish its right to claim the deduction allowed for sales to a buyer who resells).

{23} We agree with the Department's view of the exclusion. The Department's regulation and its explanation of how the regulation works are sensible interpretations of the Section 7–9–3(F)(2)(a) exclusion. The circumstances here are little different than if the manufacturers issued coupons to consumers who presented the coupons to Taxpayer to receive cigarettes at a discounted price, and Taxpayer then presented the coupons to the manufacturers to obtain reimbursement for the discounted amount.

{24} Taxpayer expresses concern that treating the buy-down contracts as taxable manufacturer coupons places her in the circumstance of not being able to pass the tax on to either the consumer or the manufacturer. Returning to her underlying rationale, Taxpayer asserts her "inability to pass along the tax ... arises because the discount payments are linked to [her] inventory purchases ... rather than to paper coupons brought in by the consumer as part of the sale," thus purportedly showing the lack of connection between the payments and her retail sales. Taxpayer's expressed concern does not persuade us. She took no steps to ascertain in advance from the Department, from legal counsel or a tax expert, or even from local business associations, whether the payments might be taxable and what the risks might be in failing to report such receipts. "Every person is charged with the reasonable duty to ascertain the possible tax consequences of his action." *Tiffany Constr. Co. v. Bureau of Revenue,* 90 N.M. 16, 17, 558 P.2d 1155, 1156 (Ct.App.1976) (affirming penalty assessment based on negligence); *see also Arco Materials, Inc. v. Taxation & Revenue Dep't,* 118 N.M. 12, 15, 878 P.2d 330, 333 (Ct.App.1994) ("A taxpayer has an affirmative duty to keep informed about changes in the tax law that might affect its liability."), *rev'd on other grounds sub nom. Blaze Constr. Co. v. Taxation & Revenue Dep't,* 118 N.M. 647, 884 P.2d 803 (1994). Furthermore, while retailers in practice may almost universally pass the tax on to consumers, the law clearly imposes the tax on the retailer. It remains a retailer's business decision as to how to compensate for that tax expense.

{25} We hold that the hearing officer's decision and order in regard to the buy-down payments was not arbitrary or capricious, and was not an abuse of discretion or contrary to law, and that her findings were supported by substantial evidence.

## C. The Shelf–Display Contract Receipts Are Taxable

{26} Under NMSA 1978, § 7–9–53(A) (1998), "[r]eceipts from the sale or lease of real property ... may be deducted from gross receipts." Leasing is defined as "an arrangement whereby, for a consideration, property is employed for or by any person other than the owner of the property." § 7–9–3(J). "[T]he granting of a license to use property is the sale of a license and not a lease." *Id.* Under 3.2.211.17(A) NMAC 2002, "[r]eceipts derived from a license to use real property may not be deducted from gross receipts." Taxpayer contends the shelf-display contracts are leases; the Department contends the contracts are licenses.

{27} The facts in the present case do not show sufficient dominion over and control of property by the cigarette manufacturers to constitute a leasehold interest. The manufacturers have neither exclusive possession nor the right to restrict access to the designated areas in Taxpayer's store. The contracts do not create or convey an interest in real property; they simply give the manufacturers authority to set up or use shelves and counters in the store for product and advertising displays. "[T]he difference between a license and a lease is that a lease gives to the tenant the right of possession against the world, while a license creates no interest in the land, but it is simply the authority or power to use it in some specific

way." *Cutter Flying Serv., Inc. v. Prop. Tax Dep't,* 91 N.M. 215, 219, 572 P.2d 943, 947 (Ct.App.1977) (internal quotation marks and citation omitted). For a lease to exist, the lessee must acquire some definite control of and dominion over the premises. *Id.* at 219–20, 572 P.2d at 947–48. "[A] lease conveys exclusive possession of the premises to the tenant, and thus, the tenant holds an estate. In contrast, a licensor retains legal possession of the land, and the licensee has only a privilege to enter for a particular purpose." Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land,* ¶ 11.01 (Rev. ed.1995) (footnote omitted).

{28} Taxpayer argues that the manufacturers' installations of displays constitute fixtures, which evidence dominion over and control of real property and indicate the parties' intent that the contracts are leases. She further argues that her maintenance duties merely confirm the manufacturers' dominion and control, in that the duties are limited to the manufacturers' specific instructions, relegating Taxpayer to the status of agent of the manufacturers.

{29} Taxpayer cites *Quantum,* 1998–NMCA–050, ¶¶ 2–3, 125 N.M. 49, 956 P.2d 848, in support of her arguments. In *Quantum,* the taxpayer remodeled and customized buildings for bingo game use under the Bingo and Raffle Act, NMSA 1978, §§ 60–2B–1 to –14 (1981, as amended through 1999), and entered into agreements permitted under the Bingo Act with non-profit organizations that conducted bingo games in the buildings during specified sessions. *Quantum,* 1998–NMCA–050, ¶ 2, 125 N.M. 49, 956 P.2d 848. In determining whether the agreements were licenses or leases, we defined "license" as " 'permission by competent authority to do an act which, without such permission, would be illegal, a trespass, a tort, or otherwise not allowable.' *Black's Law Dictionary* 920 (6th ed.1990)." *Id.* ¶ 10. Our analysis of the parties' intent, which in turn required and caused a rather extensive court analysis of the entire content of the agreements, led us to conclude that the agreements were leases within the meaning of Section 7–9–53(A). *Id.* ¶¶ 12–22. Without repeating that lengthy discussion, we see little resemblance between

Taxpayer's shelf-display contracts and the use of the taxpayer's buildings for bingo games in *Quantum.* In the present case, as indicated above, the "real estate" being used is shelves and counters. The manufacturers' representatives visit the store monthly, and can do so only during the hours the store is open for business. That Taxpayer was required to maintain the shelves indicates as much an equal and independent access and right to use the property as it does a right maintained solely as an agent in furtherance of the manufacturers' exercise of dominion and control. While in *Quantum* the taxpayer reserved some degree of control over the premises through provisions "such as those regarding public liability insurance, security guards, parking, thermostat settings, bankruptcy, and right of entry," we discounted these circumstances as "not uncommon to modern commercial leasing," and as necessary for compliance with statutory regulation. *Id.* ¶ 20.

{30} It was also important in *Quantum* that the regulatory statute, the Bingo Act, "contemplate[d] . . . a lease [as] a vehicle for non-profit organizations to use premises for conducting bingo games." *Id.* ¶ 21. This and several other aspects of the circumstances set out in *Quantum* sufficiently distinguish that case from the present to make *Quantum* inapplicable as instructive, much less controlling, precedent.

{31} In sum, the shelf-display contracts bear a much greater resemblance to a license than to the creation and conveyance of an interest in real property that would constitute a lease. The hearing officer's determination that the shelf-display contracts were not leases as contemplated under Section 7–9–53(A) was not arbitrary, capricious, or an abuse of discretion, was supported by substantial evidence, and was in accordance with law.

**D. The Penalty Assessment Was Proper**

{32} A taxpayer is subject to a penalty for failure to pay gross receipts taxes "due to negligence or disregard of rules and regulations, but without intent to evade or defeat a tax." NMSA 1978, § 7–1–69(A)

(2001). Negligence is defined by our administrative code both as the "failure to exercise that degree of ordinary business care and prudence which reasonable taxpayers would exercise under like circumstances," and as "carelessness, erroneous belief or inattention." 3.1.11.10(A), (C) NMAC 2002; *see Sonic Indus., Inc. v. State,* 2000–NMCA–087, ¶ 38, 129 N.M. 657, 11 P.3d 1219. The hearing officer determined that Taxpayer's failure to pay gross receipts tax was negligent, based on her finding that the failure was due to Taxpayer's "lack of knowledge and her erroneous belief that tax was not due on certain transactions."

{33} Taxpayer asserts that she is not subject to penalty because her business is "a very small business" and because she consulted with manufacturers about local business practice before making her decision regarding tax liability. Taxpayer testified that the manufacturers "told me the [tax] laws to go by and to look at."

{34} While Taxpayer indicates that the penalty is inappropriate because she operates a small business and made some effort to inquire about her tax liability by discussing the tax issue with the manufacturers, Taxpayer hinges her position on the hearing officer's comments that Taxpayer's failure to pay tax on the buy-down and shelf-display contract receipts was an "honest mistake," and on the Department's attorney's statement that liability was a "close issue."

{35} We see no basis on which to conclude that the hearing officer acted arbitrarily or capriciously, or abused her discretion in concluding Taxpayer was negligent under Section 7–1–69(A). Nor can we say the conclusion was not in accordance with law. Further, despite the verbal comments at the hearing, the hearing officer's determination of negligence was supported by substantial evidence. Taxpayer did not demonstrate that she reasonably attempted to ascertain whether her actions were justifiable under the tax statutes and regulations. Cigarette manufacturers are not tax experts upon whom Taxpayer could justifiably rely. *See Sonic Indus.,* 2000–NMCA–087, ¶ 39, 129 N.M. 657, 11 P.3d 1219 (requiring the taxpayer "to demonstrate that it

had acted reasonably" by "com[ing] forward with evidence showing that it had consulted with tax professionals and [had] developed compelling arguments for overruling our prior cases"); *Arco Materials,* 118 N.M. at 16, 878 P.2d at 334 ("New Mexico case law is clear that penalties may properly be assessed even when the failure to pay is based on inadvertent error or unintentional failure to pay the tax due.").

## CONCLUSION

{36} The hearing officer's decision and order is affirmed.

{37} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and CYNTHIA A. FRY, Judges.