2007-NMCA-148

170 P.3d 1017

**CORRECTIONS CORPORATION OF AMERICA OF TENNESSEE, INC., and Corrections Management Services, Inc., Plaintiffs–Appellants,**

v.

**STATE of New Mexico and Jan Goodwin, Secretary of Taxation and Revenue, Defendants–Appellees.**

No. 26,246.

Court of Appeals of New Mexico.

Sept. 18, 2007.

Sutin Thayer & Browne, Benjamin Allison, Helen Hecht, Kerry Kiernan, Santa Fe, NM, for Appellants.

Gary K. King, Attorney General, Bruce J. Fort, Special Assistant Attorney General, Santa Fe, NM, for Appellees.

## OPINION

BUSTAMANTE, Judge.

{1} Corrections Corporation of America of Tennessee, Inc. and Corrections Management Services, Inc. (collectively CCA) appeal the district court's denial of CCA's claim for a refund of gross receipts tax. CCA contends that its agreements with various governmental agencies to incarcerate prisoners constitute leases of real property and, therefore, that receipts from those agreements are deductible under the applicable tax statute. The district court held that the contracts do not constitute leases and thus the denial of the deduction was proper. We affirm, holding that, as a matter of law, the contracts are not leases for real property as contemplated by the Gross Receipts and Compensating Tax Act (the Gross Receipts Act), NMSA 1978, §§ 7-9-1 to -100 (1966, as amended through 2006).

## BACKGROUND

{2} CCA, a private company providing prison services, owns and operates three prison facilities in New Mexico. CCA entered into agreements to provide prison services and facilities with the federal Bureau of Prisons (BOP) and the New Mexico Corrections Department (NMCD). We refer to BOP and NMCD collectively as the "governmental entities." With NMCD, CCA contracted for use of and services at the New Mexico Women's Correctional Facility in Grants, New Mexico (the Grants facility). With BOP, CCA contracted for use of and services at the Cibola County Correctional Center near Milan, New Mexico (the Cibola facility). We first set out some of the details of those contracts.

## THE GRANTS FACILITY

{3} In 1988, CCA and NMCD entered into a "Management Services Agreement," pursuant to NMSA 1978, § 33-1-17 (1995), the statute that allowed the state to contract with the private prison industry to provide prisons and correctional services for the state of New Mexico. The agreement required CCA "to provide services for the operation of an adult female facility for the State of New Mexico." The contract allowed for renovation of existing facilities or construction of an entirely new one. The legislature appropriated $1,003,300 to NMCD for the "operation of a two hundred-bed facility." CCA built the facility according to the specifications detailed in the agreement.

{4} As an "independent contractor," CCA had "the sole right to supervise, manage, operate, control, and direct the performance of the details [of operating the facility]." CCA had the keys to the entire facility, including "security" areas, whereas NMCD had keys for "administrative" and "programming" areas within the prison facility but not to the housing and secure pods.

{5} NMCD did have access to the prisons and could direct CCA to allow NMCD to enter the facilities. NMCD representatives, the Governor of New Mexico, members of the legislature, and other people as designated by NMCD, had access to the Grants facility at all times. Indeed, by contract, NMCD was required to monitor the quality of CCA's performance of the corrections services.

{6} In exchange for the corrections services, NMCD paid CCA "a 'Contractor Per Diem Rate'" based on the number of inmates incarcerated at the facility each day. Under the terms of the original 1988 contract, that rate was set at $69.75 per inmate for each inmate exceeding 150 inmates. If NMCD housed 150 inmates or fewer, the per diem rate formula did not apply, and instead NMCD paid a flat rate of $318,234.38 per month.

{7} In 1998, the original payment clause was amended to reflect a change in the per diem rate and the minimum flat rate provision was replaced with the obligation that NMCD keep the facility at 90% of capacity. If NMCD housed fewer than 90% of capacity, the amended contract called for the parties to "renegotiate" a new per diem rate.

{8} Again, in 1999, the contract was amended to reflect another change in the per diem rate. This last change reduced the per diem to $52.28 for the first 322 inmates,

$45.28 for the next 194, and $11.28 for the last 80 up to the facility's then-capacity of 596 inmates.

{9} Under the agreement, NMCD had "first priority on its inmates entering the facility," but in the event that NMCD did not fill the facility to capacity with inmates, CCA had the right to "increase the inmate population ... by accepting inmates from other federal or state jurisdictions."

{10} The agreement provided that in the event CCA defaulted on its obligations to provide correctional services, CCA would have to lease the facility to NMCD "at fair market rental value" and NMCD was free to hire another contractor to perform the correctional services.

## THE CIBOLA FACILITY

{11} In June 2000, CCA contracted with BOP to provide a low-security prison and correctional services at the Cibola facility. CCA's agreement with BOP for the use and services at the Cibola facility was similar to the agreement with NMCD for the Grants facility. Under the terms of that agreement, CCA was required to take all of BOP's inmate referrals and CCA could "house only inmates designated to the facility by BOP." As in the Grants contract, BOP retained the right to monitor CCA's performance on-site, which included the right to conduct unannounced inspections. Four full-time federal officials worked at the Cibola facility monitoring the institution and the contract performance. CCA could not deny BOP access to the Cibola facility. Although BOP set guidelines for prospective employees and contractors, BOP could not require CCA to hire particular guards; they just set the standards.

{12} CCA contracted with Cibola County to house Cibola County Jail inmates in a "totally separate housing unit within the facility under the same roof." The CCA assistant warden for the Cibola facility was the assistant warden for the entire facility, not just the part utilized by BOP. In CCA's original claim for a refund, CCA included information on the percentages of space in the Cibola facility "[l]eased" not only to BOP, but also to Cibola County, the states of New Mexico and Idaho, and to the United States

Marshal. Also, with the Grants facility, CCA was paid on the agreement with BOP "based upon a daily official ... inmate count."

## CCA'S CLAIM FOR REFUND

{13} CCA filed a claim for a refund with the Taxation and Revenue Department (the Department) based on the theory that some of its receipts were deductible under the Gross Receipts Act. The Gross Receipts Act imposes a five percent tax on all receipts of "any person engaging in business." § 7-9-4(A). There is a presumption "that all receipts of a person engaging in business are subject to the gross receipts tax." § 7-9-5(A). Section 7-9-53(A) allows for the deduction of receipts from the gross receipts tax for the sale or lease of real property.

{14} CCA's original claim for a refund filed with the Department involved receipts from all three facilities; however, it only raised issues in this appeal involving the Grants and Cibola facilities. The original refund claim was for $2,465,276.38 for the period from January 1999 to October 2002. CCA does not specify on appeal the amount for which it seeks a refund; instead, it argues for the application of a specific valuation method. CCA asks this Court to remand for calculation of the amount refunded for the alleged leases. However, because we affirm the district court, we do not address the valuation issue. We also note that some issues presented at trial were not appealed. We explain only the facts necessary to understanding the issues on appeal.

{15} After a bench trial, the district court issued findings of fact and conclusions of law denying CCA's request for a refund. The district court found that CCA entered into written contracts to provide (1) for the governmental entities' use of prison facilities, (2) "corrections services at the facilities," and (3) "certain tangibles to the government agencies for consumption by the inmates." Denying the claim for a refund, the district court held that the contracts between CCA and the governmental entities were not leases. The district court made the following findings and conclusions in support of this position: (1) The governmental entities relied on CCA to gain access to the prisons; (2) the govern-

mental entities had no right to exclude CCA from the facilities or to use another subcontractor to provide corrections services "without terminating the contracts"; (3) the contracts did not create any interest in real estate, but rather they constituted "management services agreements"; (4) the contracts were "similar to arrangements for rooming houses, dormitories ... where the 'tenant' does not have unrestricted access"; and (5) the per diem contracts were not like receipts for operating apartments, but rather they were more like "receipts from operating motels and hotels" because the governmental entities could "reduce [their] obligation[s] merely by sending fewer [inmates] to the prisons on a daily basis."

{16} CCA makes several arguments in support of its position that the agreements constitute leases for real property as contemplated by the Gross Receipts Act, and therefore that it is entitled to a refund. First, CCA argues that the agreements satisfy the definition of a lease under New Mexico case law because the governmental entities had sufficient dominion and control over the prison premises. In a related argument, CCA argues that certain inconsistencies in the district court findings justify reversal because some of the findings support the conclusion that a lease exists. Finally, CCA argues that to the extent that the district court denied its refund claim because of the district court's difficulties in computing the value of the claimed refund, such difficulties do not justify the complete denial of a refund. Because we affirm the district court's denial of CCA's claim for refund based on the legal conclusion that the agreements are not leases of real property, we only address CCA's first argument.

## DISCUSSION

■ {17} CCA argues that the statutory definition, applicable case law, and the Department's own rulings support its position that the agreements with BOP and NMCD constitute leases of real property. In considering this issue, we are faced with questions of statutory construction and interpretation of written contracts between CCA and the governmental entities. We review the inter-

pretation of unambiguous written contracts and of statutory language under a de novo standard. *See Grogan v. N.M. Taxation & Revenue Dep't,* 2003–NMCA–033, ¶ 10, 133 N.M. 354, 62 P.3d 1236; *Campbell v. Millennium Ventures, LLC,* 2002–NMCA–101, ¶ 15, 132 N.M. 733, 55 P.3d 429. We are mindful that in state taxation cases, although we apply the de novo standard, we consider the issues through the lens of a presumption that the Department's assessment is correct. *TPL, Inc. v. N.M. Taxation & Revenue Dep't,* 2003–NMSC–007, ¶ 10, 133 N.M. 447, 64 P.3d 474.

{18} The Gross Receipts Act provides for a deduction of receipts from leasing real property. § 7–9–53(A). The Act defines "leasing" as "an arrangement whereby, for a consideration, property is employed for or by any person other than the owner of the property, except that the granting of a license to use property is not a lease." § 7–9–3(E). Our courts have further interpreted "lease" as "an agreement under which the owner gives up the possession and use of his property for a valuable consideration and for a definite term. The tenant must acquire some definite control and dominion of the premises." *Quantum Corp. v. State Taxation & Revenue Dep't,* 1998–NMCA–050, ¶ 9, 125 N.M. 49, 956 P.2d 848 (internal quotation marks and citations omitted). Section 7–9–53(B) specifically exempts the following from the definition of taxable gross receipts: "[r]eceipts received by hotels, motels, rooming houses, campgrounds, guest ranches, trailer parks or similar facilities," paid by "lodgers, guests, roomers or occupants." *Id.* The statute is silent on the issue of prisons.

■ {19} Although the agreements between CCA and the governmental entities are not entitled "leases," we look at the details contained within the agreements to determine their substance. *Transamerica Leasing Corp. v. Bureau of Revenue,* 80 N.M. 48, 51–52, 450 P.2d 934, 937–938 (Ct. App.1969) ("Under general law, the character of the instrument is not to be determined by its form, but from the intention of the parties as shown by the contents of the instrument.").

{20} CCA argues that the facts of this case are analogous to those in *Quantum.* In *Quantum,* this Court held that agreements between the taxpayer and non-profit organizations that conducted bingo games on taxpayer's premises were leases, and thus, the taxpayer was entitled to a deduction for the receipts under the Gross Receipts Act. *Quantum,* 1998–NMCA–050, ¶ 22, 125 N.M. 49, 956 P.2d 848. The agreements were for one-year terms whereby four or five times a week the taxpayer gave up possession and use of the property for sessions usually lasting less than four hours. *Id.* ¶ 13. The non-profit organizations paid a flat fee of $100 per session regardless of whether they actually conducted a gaming session. *Id.* ¶¶ 3, 6. The taxpayer customized the bingo spaces for the purposes of operating bingo games, *id.* ¶ 19, and the contracts contained provisions regarding "public liability insurance, security guards, parking, thermostat settings, bankruptcy, and right of entry," that tended to show the taxpayer retained control over the property. *Id.* ¶ 20. This Court in *Quantum* noted that, because of statutory requirements regulating bingo gaming, the contracts between the taxpayer and the non-profit organizations reflected limitations on the non-profit organizations' control of the premises and did not resemble typical commercial leases. *Id.* ¶ 21. But because of "[t]he payment of rent, possession for definite periods of time, exclusive possession of the floor safes and secure storage closets, and the inability of [the t]axpayer to revoke at will," this Court ultimately held that the substance of the agreement was a lease of real property, *id.,* and that even though the taxpayer retained "some degree of control over the premises," such control was "not uncommon to modern commercial leasing." *Id.* ¶ 20.

{21} In addition to *Quantum,* other law in New Mexico has addressed the issue of determining the existence of leases for real property for purposes of deductions under the Gross Receipts Tax. *See Grogan,* 2003–NMCA–033, 133 N.M. 354, 62 P.3d 1236 (affirming a hearing officer's determination that contracts between taxpayer, a retail store owner, and cigarette manufacturers, where representatives of the manufacturers set up and stocked the shelves and counter displays of the store once a month and the taxpayer refilled them throughout the month were not leases under the Gross Receipts Act because the representatives lacked dominion and control); *see also* N.M. Taxation & Revenue Dep't Ruling No. 430–94–2, 05/01/1994 (holding that monthly rental from an assisted living facility is deductible because the lease of property is not like a rooming house and is more like an apartment and receipts from services, though not billed separately, are not deductible). These cases all seem to turn on whether the taxpayer-lessor releases dominion and control over the property to the lessee.

{22} CCA argues that, as in *Quantum,* although the terms of the contract were not typical of a standard commercial lease, the governmental entities had "exclusive possession" of the prison facilities, had "unlimited twenty-four hour access to [the] prisons," had the right to designate others to access the prisons, and had the "sole ability to admit and remove inmates," all of which show that the governmental entities had the requisite dominion and control to create a lease.

{23} The Department counters that *Quantum* is distinguishable because in this case CCA, not the governmental entities, retained ultimate control over the prison facilities. The Department points to the following facts: (1) CCA kept the keys to the premises and therefore literally controlled the access to enter and leave the prison facilities; and (2) CCA employees physically occupied the prisons as guards and the governmental entities merely "retained the right to supervise CCA[ ]." The Department also argues that this case is different from *Quantum* because in that case the taxpayer did not run the bingo games, whereas in this case, CCA provides correctional services to the governmental entities on its own premises.

{24} As a preliminary matter, we do not wish to confuse the fact that CCA provided correctional services with the issue of whether CCA "leased" the prison facilities to NMCD and BOP. *See* N.M. Taxation & Revenue Dep't Ruling No. 440–98–2, 12/17/1998

(holding that taxpayer who had receipts from both leasing of real property and performing services could separately identify the receipts from the leases and the receipts from the services so as to receive the deduction). We do not consider the Department's arguments to the extent they argue that CCA's provision of correctional services necessarily negates the existence of a lease.

{25} Based on the facts with which we are presented in this case, it is unclear whether CCA or BOP and NMCD had "exclusive control" over the prison premises. The issue of control in this case is quite complicated. It is difficult to make any meaningful distinctions between CCA's possession of the keys to the prison and the governmental entities' unlimited right to have CCA open and close the doors to the premises. Fortunately, we need not do so here because another aspect of the agreements between CCA and the governmental entities, provides a meaningful and clear distinction between this case and those cases where our courts have held that the agreements constituted leases.

{26} In *Chavez v. Commissioner of Revenue*, 82 N.M. 97, 476 P.2d 67 (Ct.App.1970), as in *Quantum*, this Court held that a taxpayer was entitled to deduct receipts from a non-traditional lease. The taxpayer in *Chavez* owned a motel which the taxpayer had previously operated as a motel. *Id.* at 98, 476 P.2d at 68. The taxpayer then leased the entire motel property to a railroad company "on an annual basis." *Id.* (internal quotation marks omitted). During the period in question, the railroad paid "a fixed daily amount [that] had no relationship to the number of rooms actually occupied." *Id.* at 99, 476 P.2d at 69. At that time, the motel was not open to the public. *Id.* The taxpayer furnished bed linens and cleaned the bathrooms of the property, but the railroad paid all the utilities and provided all other services. *Id.* at 100, 476 P.2d at 70. Furthermore, the railroad, not the taxpayer, determined "who should occupy" the premises. *Id.* This Court allowed a deduction for the taxpayer, holding that the railroad was a lessee of the taxpayer's premises, and not

merely a "lodger, guest, roomer or occupant." *Id.* at 101, 476 P.2d at 71.

{27} In both *Quantum* and *Chavez*, this Court emphasized the fact that the "tenants" paid the same rental rates regardless of whether the bingo session was actually held or the rooms were actually occupied. In this case, the amount of "rent" paid to CCA is calculated based on the number of inmates housed on any given day as a "per-diem rate." If the governmental entities did not utilize the maximum capacity of the prisons, CCA retained the right to house inmates from other jurisdictions' correctional agencies.

{28} We assume that part of the reason the governmental entities contracted with CCA to pay based on a "per-diem" rate is because CCA provides services, the cost of which depends on the number of inmates. Regardless of the rationale, however, this payment arrangement and the ability of CCA to accept inmates from others militates against any notion that these contracts are leases. Because the governmental entities did not pay a fixed amount in exchange for the guarantee of physical real property to house inmates, there is no lease for real property as contemplated by the Gross Receipts Act. The fact that CCA had the right to fill up any extra space with inmates from other jurisdictions coupled with the governmental entities' paying based on the number of inmates housed, makes these agreements look more like those between "hotels, motels, rooming houses, and other facilities," and "lodgers or occupants" than leases for real property.

{29} Our holding that the contracts are not leases for real property under the Gross Receipts Act is supported by the legislature's stated policy in favor of taxation, *see* Section 7–9–5(A), and in general, our presumption in favor of the Department's assessment. *TPL*, 2003–NMSC–007, ¶ 10, 133 N.M. 447, 64 P.3d 474. We find nothing in our law to support CCA's position that we should expand the definition of "lease for real property" under the Gross Receipts Act to include agreements between governmental entities and

private prison companies. To the contrary, we construe deductions narrowly. *See Chavez*, 82 N.M. at 99, 476 P.2d at 69 ("[T]he provision for [a] deduction must be narrowly but reasonably construed.").

{30} Because we decide that, as a matter of law, these agreements are not leases for real property, we need not address CCA's additional arguments that the district court's findings of fact do not support its conclusion. Similarly, because we affirm, we need not address CCA's argument on the valuation issue.

## CONCLUSION

{31} For the reasons set forth above, we affirm the district court's denial of a refund under the Gross Receipts Act.

{32} **IT IS SO ORDERED.**

WE CONCUR: CYNTHIA A. FRY and IRA ROBINSON, Judges.