This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-37548**

**CCA OF TENNESSEE, LLC,**

Petitioner-Appellant,

v.

**NEW MEXICO TAXATION AND
REVENUE DEPARTMENT,**

Respondent-Appellee,

**IN THE MATTER OF THE PROTEST
TO ASSESSMENT ISSUED UNDER
LETTER ID. NO L1081049392.**

**APPEAL FROM THE ADMINISTRATIVE HEARINGS OFFICE
Chris Romero, Hearing Officer**

Sutin, Thayer & Browne
Suzanne W. Bruckner
Andrew J. Simons
Wade L. Jackson
Albuquerque, NM

for Appellant

Hector H. Balderas, Attorney General
David Mittle, Special Assistant Attorney General
Santa Fe, NM

Albuquerque, NM

### MEMORANDUM OPINION

**VARGAS, Judge**.

**{1}** CCA of Tennessee, LLC (Taxpayer) appeals from the administrative hearing officer's (AHO) decision and order denying its protest from the New Mexico Taxation and Revenue Department's (the Department) assessment of unpaid gross receipts taxes against Taxpayer in the amount of $3,634,154.91, including penalties and interest, from January 31, 2010 to September 30, 2015. Taxpayer raises two issues on appeal. First, Taxpayer argues that the AHO's decision that it was not entitled to a deduction from applicable gross receipts tax, pursuant to NMSA 1978, Section 7-9-47 (1994) is contrary to law, and not supported by substantial evidence. Second, Taxpayer contends that if it was not entitled to a deduction, it was entitled to safe harbor protection because it received a nontaxable transaction certificate, relieving it of its obligation to pay the tax. [1] We affirm the AHO's decision that Taxpayer was not entitled to take advantage of the deduction set out in Section 7-9-47, but reverse his decision that Taxpayer was not entitled to safe harbor protection.

## BACKGROUND

**{2}** Taxpayer is a private prison corporation that contracts with government entities to provide prison facilities and services to operate the prisons. Taxpayer is the owner of the Torrance County Detention Center (the detention center) and has owned the facility since it was built in 1990. In November 2010, Taxpayer entered into a Contract for Inmate Confinement (CIC) with Torrance County, New Mexico (the County). The CIC describes Taxpayer as the "owner and operator" of the detention center and acknowledges that "the County is in need of such space for housing detained inmates." The CIC charges Taxpayer with incarcerating, detaining, and releasing inmates in accordance with authorization from the County. Taxpayer is also required to provide security services, routine medical care to inmates, as well as transportation in a medical emergency. The CIC also requires Taxpayer to store and safe-keep inmate personal property and provide work programs for inmates. David Garfinkle, Taxpayer's chief financial officer, testified that Taxpayer's responsibilities under the CIC included housing inmates, providing guards, correctional services, utilities, water, waste removal, laundry, facility maintenance, and meal services. In exchange for Taxpayer's services and use of its facility to provide those services, the County was required to pay Taxpayer a daily rate of $52 per day for male inmates and $54 per day for female inmates. The CIC also permitted Taxpayer to house County inmates with federal inmates at the detention center.

---

1The Department argues that we should not consider the arguments raised by Taxpayer because Taxpayer's brief in chief fails to comply with our Rules of Appellate Procedures. While we do not find that Taxpayer's brief in chief is so deficient as to preclude review on the merits, we caution counsel to carefully review Rule 12-318 NMRA (2016), particularly with respect to its obligation to provide specific citations to the record proper, to avoid future violations. *See Santa Fe Expl. Co. v. Oil Conservation Comm'n*, 1992-NMSC-044, ¶ 11, 114 N.M. 103, 835 P.2d 819 (declining to disregard the respondent's arguments or accord them less weight notwithstanding respondent's failure to comply with the appellate rule of procedure requiring citation to the record proper and transcripts); *see also Fenner v. Fenner*, 1987-NMCA-066, ¶ 28, 106 N.M. 36, 738 P.2d 908 (cautioning counsel regarding violations of our appellate rules).

**{3}**      Several years earlier, and presumably under a prior version of the CIC, [2] the County entered into an intergovernmental service agreement (ISA) with the United States Marshals Service Prisoner Services Division (USMS) dated April 1, 2002, "for the housing, safekeeping, and subsistence of federal prisoners" at the detention center. Taxpayer's CFO, Garfinkle, testified that notwithstanding that Taxpayer was not a party to the ISA, it performed the County's obligations under the ISA, invoiced and collected amounts due to the County from the USMS under the ISA and shared the revenues it collected with the County, all pursuant to a subcontract between Taxpayer and the County that was not produced to the Department or introduced at the hearing. Indeed, the Department introduced copies of several invoices showing that Taxpayer invoiced the USMS directly for the housing of inmates during the relevant period, but it did not introduce a copy of the purported subcontract.

**{4}**      In April 2014, Taxpayer applied and received approval for a refund of gross receipts tax paid for the reporting periods between January 1, 2010 and December 31, 2012, related to the receipts collected for housing the USMS inmates, totaling $3,996,196.01. In December 2016, the Department subsequently conducted an audit of Taxpayer for the periods between January 1, 2010 and September 30, 2015, and found that Taxpayer was not entitled to the refund previously issued and assessed Taxpayer $3,634,154.91 for gross receipts tax, withholding tax, penalties, and interest. Taxpayer subsequently filed a formal protest of that assessment, asserting that the receipts it received from the USMS are deductible as proceeds from the sale and resale of a license pursuant to Section 7-9-47, and if they are not deductible, Taxpayer is exempt from paying the gross receipt taxes on those proceeds under the safe harbor provision set out in NMSA 1978, Section 7-9-43(A) (2011, amended 2018). The AHO held a hearing on Taxpayer's protest in May 2018 and entered its decision and order denying the protest in July 2018. This appeal follows.

## DISCUSSION

### I.      Standard of Review

**{5}**      This Court may only set aside the decision and order of an administrative hearing officer if it is: "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with the law." NMSA 1978, § 7-1-25(C) (2015). Taxpayer's appeal requires that we address questions of statutory construction and contract interpretation. "We review the interpretation of unambiguous written contracts and of statutory language under a de novo standard." *Corr. Corp. of Am. v. State of N.M.*, 2007-NMCA-148, ¶ 17, 142 N.M. 779, 170 P.3d 1017. However, as we undertake our de novo review "[w]e consider the issues through the lens of a presumption that the Department's assessment is correct." *Id.*

---

2While the November 2010 CIC is the only contract between Taxpayer and the County in the record, we assume that an earlier contract existed and was in place at the time the County entered into the ISA.

## II. The AHO Did Not Err in Finding That Taxpayer Was Not Entitled to a Deduction Under Section 7-9-47

**{6}** Our Legislature has determined that "[f]or the privilege of engaging in business, an excise tax equal to five and one-eighth percent of gross receipts is imposed on any person engaging in business in New Mexico." NMSA 1978, § 7-9-4(A) (2010). "[I]t is presumed that all receipts of a person engaging in business are subject to the gross receipts tax." NMSA 1978, § 7-9-5(A) (2019). Furthermore, "[a]ny assessment of taxes or demand for payment made by the department is presumed to be correct." NMSA 1978, § 7-1-17(C) (2007). In light of these presumptions, "the party claiming entitlement to an exemption or deduction from the gross receipts tax bears the burden of clearly overcoming" the presumptions. *Pub. Serv. Co. of N.M. v. N.M. Tax'n & Revenue Dep't*, 2007-NMCA-050, ¶ 32, 141 N.M. 520, 157 P.3d 85. "The exemption must be clearly and unambiguously expressed in the statute, and must be clearly established by the taxpayer[.]" *Id.* (internal quotation marks and citation omitted). We will construe the statute "strictly in favor of the taxing authority." *Id.* (internal quotation marks and citation omitted).

**{7}** Taxpayer claims it is entitled to deduct payments it received from the USMS pursuant to Section 7-9-47, which provides:

> Receipts from selling tangible personal property or licenses may be deducted from gross receipts or from governmental gross receipts if the sale is made to a person who delivers a nontaxable transaction certificate to the seller. The buyer delivering the nontaxable transaction certificate must resell the tangible personal property or license either by itself or in combination with other tangible personal property or licenses in the ordinary course of business.

**{8}** At the core of the dispute between the parties is whether the CIC and ISA were for the sale of services or a license, and whether Taxpayer is entitled to a deduction if the contracts contemplate the sale of both. Here, Taxpayer contends the AHO's decision must be reversed because the payments it received from the USMS constituted, at least in part, receipts from the sale of a license to the County to use the detention center, who then resold it to the USMS, qualifying Taxpayer for a deduction under Section 7-9-47. Taxpayer contends that the AHO erred as a matter of law when it applied the "predominant ingredient" test set out in NMSA 1978, Section 7-9-3(P) (2007, amended 2019) to the facts of this case rather that applying this Court's holding in *Corrections Corp. of America*, 2007-NMCA-148, to determine Taxpayer's entitlement to a deduction under Section 7-9-47.

### A. The AHO Correctly Applied the Law

**{9}** We first address Taxpayer's reliance on *Corrections Corp. of America.* In that case, we considered whether taxpayer's contracts with government agencies to incarcerate prisoners in exchange for a per-diem payment for each incarcerated

prisoner constitutes a lease of real property, entitling taxpayer to a deduction under NMSA 1978, Section 7-9-53(A) (1998); *Corr. Corp. of Am.*, 2007-NMCA-148, ¶¶ 1, 18. Examining "the details contained within the agreements to determine their substance," this Court concluded that the "payment arrangement and the ability of [a taxpayer] to accept inmates from others militates against any notion that these contracts are leases." *Id.* ¶¶ 19, 28. In *Corrections Corp. of America*, this Court expressly noted that it did "not consider the [d]epartment's arguments to the extent they argue that [the taxpayer's] provisions of correctional services necessarily negates the existence of a lease," *id.* ¶ 24, but cited a department ruling permitting a taxpayer who received receipts from both leasing of real property and performing services to deduct receipts from leases when they were separately identified from those for services. *Id.* (citing N.M. Tax'n & Revenue Dep't Ruling, No. 440-98-2, 12/17/1998).

**{10}** Taxpayer contends that *Corrections Corp. of America* stands for the proposition "that [the taxpayer] could have sold correctional services and, at the same time, leased the correctional facility to the purchaser of the correctional services" and asks us to analogize the rule to the licensing of the correctional facility. Taxpayer overstates the ruling in *Corrections Corp. of America*. While in *Corrections Corp. of America*, this Court recognized that the department had previously ruled that a taxpayer was permitted to deduct receipts from leases when they were separately identified from those for services, this Court expressly declined to consider whether, under the facts of that case, the provision of services negated the existence of a lease, instead concluding that other characteristics of the agreement between the parties precluded a finding that the agreement constituted a lease. *See id.* ¶¶ 24, 28. In this case, even if we were to hold that the AHO "erred when he made a binary choice between [Taxpayer's] sale of prison management services and its sale of a license to the County," Taxpayer testified that it did not allocate the income it received from the County's and USMS's per diem payments between services and the facility. *See Pub. Serv. Co. of N.M.*, 2007-NMCA-050, ¶ 32 (holding that the party claiming a deduction from gross receipts tax bears the burden of overcoming the presumption that all receipts of a person engaging in business are taxable). And on appeal, Taxpayer makes no attempt to explain how its receipts should be allocated separately. Thus, we are not persuaded that the holding in *Corrections Corp. of America* assists in the resolution of this matter.

**{11}** Concluding that our decision in *Corrections Corp. of America* is not applicable to the case before us, we move on to Taxpayer's claim that the AHO erred when it performed the "predominant ingredient" test set out in Section 7-9-3(P). Section 7-9-3(P) provides in relevant part:

> "service" means all activities engaged in for other persons for a consideration, which activities involve predominantly the performance of a service as distinguished from selling or leasing property . . . . In determining what is a service, the intended use, principal objective or ultimate objective of the contracting parties shall not be controlling.

"The [predominant ingredient] test is applied when a transaction includes both the performance of services and the sale or lease of property to determine which of these constitutes the predominant ingredient of the transaction." *Rauscher, Pierce, Refsnes, Inc. v. Tax'n & Revenue Dep't of N.M.*, 2002-NMSC-013, ¶ 36, 132 N.M. 226, 46 P.3d 687; *see also E G & G, Inc. v. Dir., Revenue Div. Tax & Revenue Dep't*, 1979-NMCA-139, ¶¶ 7-9, 94 N.M. 143, 607 P.2d 1161 (recognizing that the Legislature's adoption of the "predominant ingredient" test, "chang[ed] the test from one focusing on the end product's value to the purchaser to one focusing on the nature of seller's activity[,] seller's relative investment of skills and material"); *Phillips Mercantile Co. v. N.M. Tax'n & Revenue Dep't*, 1990-NMCA-006, ¶ 15, 109 N.M. 487, 786 P.2d 1221 (recognizing that "New Mexico has adopted the predominant ingredient test in determining whether an activity is a service or the sale of tangible property").

**{12}** Taxpayer concedes on appeal that the contracts at issue included the sale of "*both* . . . prison management services, *and* a license to use the [detention center]." Taxpayer's concession departs slightly from its argument before the AHO, where it similarly conceded that services were a part of the CIC and ISA, but argued those services were merely ancillary to the purported license to use the real property. Taxpayer's concession that the contract between the parties included the sale of both services and property mandated that the AHO apply the predominant ingredient test to determine whether the activities contemplated by the CIC involved "predominantly the performance of a service as distinguished from selling . . . property." Section 7-9-3(P). We find no error in the AHO's application of the "predominant ingredient" to this case.

**B.      The AHO's Decision and Order Is Supported by Substantial Evidence**

**{13}** Next, Taxpayer contends that the AHO's decision and order is not supported by substantial evidence, arguing that the AHO's interpretation of the contract between Taxpayer, the County, and the USMS was incorrect because the "County could neither incarcerate or detain prisoners, nor provide them with the care rightfully due them as detainees *without the use of the facility*." (internal quotation marks omitted). Additionally, Taxpayer argues that the AHO had no evidence that either Taxpayer or the County intended the contract to be for the sale of services and that any such intent is not controlling. Last, Taxpayer argues that the AHO marginalized the testimony of Taxpayer's chief financial officer in finding that Taxpayer provided direct services to the USMS rather than as a sale to the County who resold the goods to the USMS.

**{14}** We review the whole record in the light most favorable to the AHO's decision in order to determine whether substantial evidence supports the decision. *See Duke City Lumber Co. v. N.M. Env't Improvement Bd.*, 1984-NMSC-042, ¶¶ 13-14, 101 N.M. 291, 681 P.2d 717. "To conclude that an administrative decision is supported by substantial evidence in the whole record, the court must be satisfied that the evidence demonstrates the reasonableness of the decision. No part of the evidence may be exclusively relied upon if it would be unreasonable to do so. The reviewing court needs to find evidence that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the

agency." *Nat'l Council on Comp. Ins. v. N.M. Corp. Comm'n*, 1988-NMSC-036, ¶ 8, 107 N.M. 278, 756 P.2d 558.

**{15}** Following the administrative hearing, the AHO found that "the intention underlying the CIC was to contract for the provision of services, and that any interest in real property was subordinate to the provision of those services[.]" He also found that "there is nothing in the ISA . . . to indicate that either party perceived that agreement to establish the re-sale of such license [and] . . . the predominant component in the ISA providing for the incarceration of USMS inmates was also services." Thus, "Taxpayer did not meet its burden of establishing it was entitled to the deduction under . . . Section 7-9-47[,]" because the CIC and ISA "predominately involved the performance of services." Additionally, the AHO found that even if the parties were engaged in the sale and resale of a license, Taxpayer provided no evidence to establish that the County was reselling the license in the ordinary course of business, as required under Section 7-9-47. On that point, the AHO specifically found that "[t]here is insufficient evidence to permit any inference that purchasing and re-selling licenses for the incarceration of federal prisoners comes within [the County's statutory] powers such that it might be determined that those transactions are within [the County's] ordinary course of business."

**{16}** Our review of the record reveals that Taxpayer presented the testimony of Mr. Garfinkle, who testified to Taxpayer's contracting process between the County, stating that "we sold a license to Torrance County who resold that license to USMS . . . . We performed services under a subcontract with the County and provided identical arrangements under a direct contract with Torrance County." Mr. Garfinkle testified and Taxpayer conceded that the CIC and the ISA admitted into evidence required Taxpayer to provide certain services, including, among others, medical services, transportation services, and supervision and monitoring services. Mr. Garfinkle testified that while those services were necessary to run the detention center, they were merely ancillary to the license of the detention center it sold to the County and the County sold to USMS. He contended that "[p]rimarily [the CIC] was for the incarceration of [the County's] inmate population, to provide the physical plant, the building structure where they could be confined," explaining that the physical structure and the fixtures, furniture and equipment in the structure of the facility were necessary because "you couldn't do it without the facility." Mr. Garfinkle testified that while Taxpayer invoiced and sent bills directly to USMS for housing the federal inmates, they were not providing direct services to the USMS. Instead, Taxpayer testified, that its invoicing and payment arrangement was done with the authority of the County. Because Taxpayer billed the USMS directly, on receipt of that payment, it would remit to the County its share of the payment under a subcontract.

**{17}** On cross examination, Mr. Garfinkle conceded that neither the CIC or ISA expressly stated it was for the sale of a license, while each contained specific language regarding the services Taxpayer would provide, and Taxpayer indeed provided a number of services to "incarcerate and detain" the inmates as required by the contracts.

**{18}** The Department offered the testimony of Shurong Li, the auditor who conducted the audit and assessment in this case. Ms. Li, whose narrative of the audit was admitted into evidence, testified that she reviewed both contracts and "the contract is very clear that [Taxpayer] provided all kinds of service for [the] County and not the sale of a license to the County. The contract is very clear it is for the housing and safe care for the inmates. It is a service not a license." Ms. Li clarified that she based her conclusion on the fact that both the CIC and ISA were primarily to provide services and neither contract mentioned a license at all. Ms. Li further testified that based on Taxpayer's invoices directly to the USMS, the USMS and the County were paying for Taxpayer's services. Additionally, Ms. Li testified that it did not matter that the County held a Type 2 nontaxable transaction certificate in this case because even if the contracts were for the sale of a license, for the deduction to apply, the County must be reselling the license in their ordinary course of business, but the resale of any license to use the detention center is not in the County's ordinary course of business.

**{19}** We also consider the terms of the CIC and ISA themselves. Beginning with the CIC, we note that the document is entitled "Contract for Inmate Confinement." Taxpayer contends the title of the document is evidence that the contract is a license for use of its facility to confine inmates. However, the CIC contemplates accomplishing this confinement by more than just placing inmates within the walls of the facility. Indeed, it requires Taxpayer to provide guards and security, services that are necessary to confine inmates to the facility. The CIC also identifies Taxpayer as the "owner and operator" of the detention center, indicating that Taxpayer not only owns the property, but provides some kind of services to operate the property—in this case as a detention center. The CIC's recognition that "the County is in need of . . . space for housing detained inmates" supports Taxpayer's claim that the CIC contemplated both a license to use the facility along with an agreement to provide services; however, this recognition must be considered in light of the other contract terms, charging Taxpayer with incarcerating, detaining and releasing inmates, as well as providing security services, routine medical care, transportation in medical emergencies, safekeeping inmate property, providing work programs, laundry, and meal services.

**{20}** We also look to the terms of the ISA, which Taxpayer concedes it undertook to perform pursuant to a subcontract agreement with the County. The ISA states that its purpose "is for the housing, safekeeping and subsistence of federal prisoners." By the terms of the ISA, "[t]he local government agrees to accept and provide for the secure custody, care and safekeeping of federal prisoners." It requires the local government to receive and discharge inmates, as well as provide adequate jail staff, full coverage of security posts and full surveillance, medical care, transportation and escort guard services, and meals. Again, as was the case with the CIC, the ISA contemplates more than just placing inmates within the walls of the facility, but instead requires Taxpayer to provide significant services to safekeep those inmates and provide for their subsistence.

**{21}** Reviewing the whole record in the light most favorable to the decision of the AHO, we cannot conclude that the AHO erred in determining that the CIC and ISA were predominantly for services and the receipts therefrom are therefore ineligible for the

deduction under Section 7-9-47. Based on the language of the CIC and ISA and the testimony of Ms. Li and Mr. Garfinkle, we conclude that the evidence is sufficient to allow a reasonable mind to accept as adequate the conclusion that the CIC and ISA were predominantly for the provision of Taxpayer's services, rather than for the sale of a license to use the facility. *See Na'l Council on Comp. Ins.*, 1988-NMSC-036, ¶ 8.

**{22}** We further note that the AHO's finding that the resale of the license of the detention center would not fall within the County's ordinary course of business was unchallenged by Taxpayer and is binding on appeal. *Lopez v. N.M. Dep't of Tax'n & Revenue*, 1997-NMCA-115, ¶ 5, 124 N.M. 270, 949 P.2d 284 ("Unchallenged findings of fact are binding on appeal."). Even if the AHO found that the CIC and ISA were predominantly for the sale of a license to use the detention center, Taxpayer would not be entitled to the deduction under Section 7-9-47, which requires that the resale be in the ordinary course of business. *See* § 7-9-47. Therefore, we are satisfied that the record as a whole supports the AHO's decision and order that Taxpayer failed to meet its burden to establish an entitlement to the deduction under Section 7-9-47.

### III.     The AHO's Decision That the Safe Harbor Provision of Section 7-9-43 Did Not Apply Was Contrary to Law

**{23}** Taxpayer next argues that the AHO erred in denying Taxpayer the "safe harbor" protection in Section 7-9-43(A), arguing that the AHO misinterpreted Section 7-9-43(A)'s requirements, when it concluded Taxpayer's transaction with the County must be non-taxable pursuant to some exemption or deduction in order for the safe harbor provision to apply. Taxpayer contends that the safe harbor provision should apply because the County provided a Type 2 nontaxable transaction certificate (NTTC), which covers receipts for the sale and resale of the license of the detention center, and a "seller may in good faith take an NTTC from a customer even if it is subsequently determined that the receipts from that customer are not in fact eligible for the deduction that customer certified." At the time Taxpayer filed its protest, the safe harbor provision in Section 7-9-43(A) (2011) stated in relevant part:

> When the seller or lessor accepts a nontaxable transaction certificate within the required time and in good faith that the buyer or lessee will employ the property or service transferred in a nontaxable manner, the properly executed nontaxable transaction certificate shall be conclusive evidence, and the only material evidence, that the proceeds from the transaction are deductible from the seller's or lessor's gross receipts.

**{24}** Taxpayer contends that this Court's decision in *Leaco Rural Telephone Coop., Inc. v. Bureau of Revenue*, 1974-NMCA-076, 86 N.M. 629, 526 P.2d 426, provides the answer to the question before us. In *Leaco*, the taxpayer claimed a deduction under the statute permitting a deduction for the sale of tangible personal property, claiming that its sale of telephone communication was such property. *See id.* ¶ 2. In support of its claim, the taxpayer argued that telephone communication required electricity and electricity was statutorily defined as tangible personal property. *See id.* ¶ 3. Concluding that "more

is involved in the telephone business tha[n] the sale of electricity," and "[a] telephone company renders a service," this Court held that "the receipts for which deductions were claimed were not receipts from selling tangible personal property" such that taxpayer would be entitled to a deduction. *Id.* ¶¶ 6, 7, 9. In *Leaco*, this Court next turned to the effect of the NTTCs provided to the taxpayer. *Id.* ¶ 11. An NTTC, this Court explained, becomes conclusive evidence of deductibility when a properly completed and signed NTTC is timely accepted in good faith. *Id.* ¶ 15. This Court held that "deduction[s] based on NTTCs held in compliance with [what is now Section 7-9-43(A) are] not conditioned upon proper issuance of the NTTC." *Leaco*, 1974-NMCA-076, ¶ 20. Indeed, "[w]hether the NTTC has been properly issued is a matter between the [Department] and the one who issues the NTTC." *Id.* Thus, while the taxpayer's sales were not actually deductible "in the first instance," and the buyer therefore improperly issued NTTCs to the taxpayer, once the taxpayer accepted the NTTCs in good faith, it was protected from tax liability under the safe harbor provision set out in Section 7-9-43(A). *Leaco*, 1974-NMCA-076, ¶ 22.

**{25}** The Department, by contrast, encourages us to rely on *McKinley Ambulance Service v. Bureau of Revenue*, 1979-NMCA-026, 92 N.M. 599, 592 P.2d 515. In *McKinley Ambulance Service*, this Court considered whether a taxpayer who claimed he was entitled to deduct receipts for intrastate ambulance services could claim safe harbor protection under Section 7-9-43(A) when the relevant statute only allowed for deductions of receipts for interstate ambulance services. *McKinley Ambulance Serv.*, 1979-NMCA-026, ¶¶ 6, 10, 13. The taxpayer claimed that "he accepted a nontaxable transaction certificate in good faith, and the certificate is conclusive evidence that proceeds from intrastate transportation of ambulance passengers were deductible." *Id.* ¶ 10. This Court held that "[t]he 'conclusive evidence' provision of [Section] 7-9-43(A) . . . does not apply unless the certificate covered the receipts in question," *McKinley Ambulance Serv.*, 1979-NMCA-026, ¶ 10, and "[t]here being no certificate applicable to taxpayer's in-state services, the failure to approve a deduction on the basis of receipts from in-state services was not error." *Id.* ¶13.

**{26}** We agree with Taxpayer. This case is not akin to *McKinley Ambulance Service.* In *McKinley Ambulance Service*, the deduction the taxpayer claimed did not exist in our statutes. The taxpayer sought to deduct receipts for in-state ambulance services despite the fact that there was no provision in New Mexico law that permitted such a deduction. Instead, we hold that the facts presented by this case are controlled by this Court's decision in *Leaco.* Notwithstanding that Taxpayer's sale of correction services to the County were not deductible pursuant to Section 7-9-47 as the sale of a license, rendering the County's NTTC improperly issued, the fact is, New Mexico law does provide the deduction Taxpayer claimed; and, once Taxpayer accepted the NTTCs in good faith, it was protected from tax liability under the safe harbor provision set out in Section 7-9-43(A).

**{27}** The Department claims that Taxpayer is not entitled to rely on the County's NTTC because it did not accept the NTTC in good faith. While the AHO's decision is silent as to whether Taxpayer accepted the NTTC from the *buyer* in good faith, it does

find that any reliance by Taxpayer on the statement by the Department's audit bureau chief, Rebecca Abbo, that the Department "agree[s] that [Taxpayer] can accept a type 02 NTTC for the receipts derived from hous[ing] the inmates from USMS" is unreasonable. However, the representation of the Department is not the issue. "[T]he timely delivery of a NTTC from the buyer to the seller conveys a message to the seller that the use of the NTTCs is such that the seller is entitled to [the stated] deductions . . . . It represents a statement by the [buyer] that its use is such that the seller is entitled to a *deduction* from its taxable receipts." *Cont'l Inn of Albuquerque, Inc. v. N.M. Tax'n & Revenue Dep't*, 1992-NMCA-030, ¶ 13, 113 N.M. 588, 829 P.2d 946 (internal quotation marks and citation omitted). And whether the NTTC was properly issued is a matter between the Department and the County. *See Leaco*, 1974-NMCA-076, ¶ 20. Indeed, "[t]he good faith belief of the seller may rest solely upon the representations made by the buyer in the exemption certificate, as such reliance fulfills the function of exemption certificates." *Siemens Energy & Automation, Inc. v. N.M. Tax'n & Revenue Dep't*, 1994-NMCA-173, ¶ 15, 119 N.M. 316, 889 P.2d 1238 (internal quotation marks and citation omitted). Absent evidence that Taxpayer did not accept the NTTC from the County in good faith, we hold that Taxpayer is entitled to the protection of the safe harbor provision set forth in Section 7-9-43.

**CONCLUSION**

**{28}**   For the aforementioned reasons, we affirm in part and reverse in part.

**{29}   IT IS SO ORDERED.**

**JULIE J. VARGAS, Judge**

**WE CONCUR:**

**KRISTINA BOGARDUS, Judge**

**SHAMMARA H. HENDERSON, Judge**